IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHN L. DYE, JR.,

     Plaintiff,

  v.              OPINION & ORDER

ERIC KOEHLER, CARLO GAANAN, LOYDA LORIA,   14-cv-76-jdp
and MICHELE ANDRADE,

     Defendants.

---

Plaintiff John Dye, a prisoner incarcerated at the Waupun Correctional Institution, brings Eighth Amendment medical care and First Amendment retaliation claims against defendant prison officials for failing to adequately address his severe neck pain and canceling a medication used to treat his mental illness. Dye says that defendant doctors Loyda Loria and Carlo Gaanan persisted in giving him ineffective pain medication for his neck, defendant Dr. Michele Andrade abused her authority as the doctor coordinating his care by failing to treat or refer him for treatment for his neck pain, defendant therapist "Eric" cut his physical therapy short for no reason, and that Andrade canceled his psychotropic medication in retaliation for him bringing this lawsuit against her.

The parties have filed dueling motions for summary judgment. After considering the parties' submissions, I conclude that Dye has failed to show that any of the defendants violated his constitutional rights, so I will grant defendants' motion for summary judgment, deny Dye's motion, and dismiss the case.

## UNDISPUTED FACTS

The following facts are drawn from the parties' summary judgment materials and are undisputed unless noted otherwise.

Similar to his previous case in this court, *Dye v. Klemz*, No. 13-cv-284-jdp, 2018 WL 502737, at *2 (W.D. Wis. Jan. 22, 2018), Dye's summary judgment materials do not fully comply with this court's procedures. But given his status as a pro se litigant, I will excuse minor, technical defects in his materials. Here, Dye did not submit his own proposed findings of fact, and his responses are often conclusory statements disputing defendants' proposed findings without offering his own version of events explaining why he disputes a particular finding. Nor does he submit a declaration stating under penalty of perjury his own version of events. So much of defendants' version is undisputed. But where the summary judgment exhibits, mostly medical records or internal grievances, contain statements by Dye recounting the events in question, I will consider those statements to be his version of events.

From January 2013 to February 2014, Dye was an inmate at the Wisconsin Resource Center (WRC). At WRC, a mental-health treatment facility, a prisoner is assigned a psychiatrist to act as his "primary doctor to provide general medical and psychiatric care as a part of a multidisciplinary treatment team." Dkt. 58, at 7. Defendants Carlo Gaanan and Loyda Loria (general-practice physicians), Eric Koehler (a physical therapist), and Michele Andrade (a psychiatrist) were all employees at WRC for at least part of the events in question. Andrade later worked at the Waupun Correctional Institution (WCI).

### A. Neck pain

Dye first sought treatment for his neck pain after he was transferred to WRC in January 2013. On January 28, Dye was seen by defendant Dr. Gaanan. Gaanan examined him and

noted "mild tenderness" and "mild pain on motion, but no limitation of motion." He ordered an x-ray and a follow-up appointment, and prescribed capsaicin cream, a topical medication used to treat pain. Gaanan also prescribed Relafen 500 mg, a nonsteroidal anti-inflammatory medication. The radiologist found "minimal to mild degenerative changes . . . as evidenced by mild osteophytic spurring." Dkt. 53-1, at 45.

In February 2013, Dye wrote two health service requests (HSR) complaining of neck pain. Nurses initially responded by telling him to take his pain medication. On March 5, Gaanan ordered an increase in the dosage of Dye's Relafen from 500 mg to 1000 mg. Dye states that the main purpose of the March 5 visit was his thumb problems, not his neck.

On April 18, Dye was seen by defendant psychiatrist Andrade. Andrade reported that Dye told her that "his medications 'are doing okay.'" Dye disputes this. Andrade reviewed Dye's medical chart and noted that "he is actually being followed by Dr. Gaanan for his pain control and so we'll defer to Dr. Gaanan regarding those issues." *Id.* at 76.

On May 8, Dye wrote another HSR: he sought to be put on a pain patch instead of the capsaicin cream. After consulting with Gaanan, the nurse stated that no medication changes would be made and that Dye had already been seen numerous times for the same complaints.

On May 21, Dye was again seen by Andrade. Andrade characterized Dye's demeanor as "irritable," "entitled," and "slightly oppositional." *Id.* at 75. Dye complained about neck pain, but Andrade reported that he did not appear to be in acute pain. Andrade referred Dye to a general practitioner for follow up on pain treatment. The next day, Dye was seen by defendant Dr. Loria, who reviewed Dye's history of neck pain and noted the minor degenerative changes shown on the previous x-ray. Loria reported that Dye was not taking the Relafen as often as prescribed, but because Dye said that it was not working, Loria discontinued

it and replaced it with naproxen 500 mg. Loria also referred Dye to the physical therapist for neck exercises, and he told Dye to fill out another request if there was no improvement in his condition.

Andrade saw Dye again on June 25 for another follow up. Andrade says that Dye complained of severe back pain but not neck pain. Dye disputes this, although he does not explain which part he disputes. The parties also dispute what Dye said about his pain treatment. Andrade says that Dye told her that he had not been seen by anybody for his pain, even though the medical records showed that he had been seen by Loria a month prior. Dye says that he complained that his pain treatment was inadequate. Andrade says that she told Dye that he always seemed angry, and his response was "'what do you come up with that' in a very angry, demeaning tone," and "I have a right to be angry." *Id.* at 70. Andrade scheduled Dye for a follow up but did not change his pain treatment.

Dye started his physical therapy in mid July 2013. The parties do not agree on the identity of the therapist who treated Dye. Dye named as a defendant therapist "Eric." Defendants accepted service on behalf of a WRC therapist named Eric Koehler, but Koehler states that he was never Dye's physical therapist at WRC. Fellow therapist Robert Rhodes states that he was the therapist who saw Dye, and he recounts Dye's treatment records in defendants' proposed findings of fact. Keeping in mind that the parties dispute the identity of the therapist, Rhodes's proposed findings are listed below. I will discuss the identity issue in the analysis section of the opinion.

Rhodes says that he assessed Dye on July 17, 2013. After the assessment, Rhodes issued him a home exercise program, consisting of range of motion and postural exercise, and instructed him to perform the exercises twice daily with three to five repetitions per exercise.

4

Rhodes also wrote Dye a plan of care for Dye to see Rhodes for physical therapy twice a week for one to two weeks, for a total of three to four sessions. Before he left, Rhodes also advised Dye of his "no-show policy," which he says is necessary because of the extensive waiting list for physical therapy:

> This is a policy I developed for my patients since I work in a number of institutions and often have a 4-6 week waiting list for patients waiting to get into see me. I explain my policy to all patients at their initial visit and again if they show up late for a subsequent appointment. I state that if a patient does not show up on time for a scheduled appointment it is considered a "No Show". If they do this two times and I have to track them down to get the[m] their scheduled appointment or if they are noncompliant with their home exercise program, I will discharge them from physical therapy.[1]

Dye's first physical therapy session was scheduled for 3:15 p.m. on July 22. When Dye failed to show up on time, Rhodes called his housing unit twice to track him down, resulting in what Rhodes deemed to be a "no show." Dye eventually arrived 15 to 20 minutes late, and Rhodes says that Dye admitted to poor compliance with his home exercise program, and that Dye did not demonstrate a working knowledge of the exercises he was given. Although Dye admits that there was a session that day, he calls Rhodes's report of this meeting a "fabrication."

Dye was scheduled for another therapy session on July 24, but he again failed to show up on time. Rhodes called his housing unit to locate him, and Dye arrived 12 to 15 minutes late. Rhodes again says that Dye did not demonstrate a working knowledge of the home

---

[1] The version of the policy included in defendants' proposed findings of fact is written in the second person and block-quoted, making it appear to be the actual policy given to inmates. But defendants' proposed finding of fact cites Rhodes's declaration, which provides a similar—but not identical—first-person recounting of that policy. The version from Rhodes's declaration is included in the opinion. In the future, the Department of Justice should make sure to more accurately support its proposed findings of fact.

exercise program. Rhodes discontinued the therapy for Dye's second "no show." Rhodes later explained to Dye that he could be seen again in therapy, but only after he explained his noncompliance to the referring physician.

On July 30, Dye wrote an HSR complaining of severe neck pain. A nurse met with Dye, and noted that Dye did not appear to be in obvious pain, that Dye had skipped his schedule appointment that day with Andrade, and that he was not taking his naproxen as scheduled.

On August 8, in response to another HSR, defendant Loria wrote an order discontinuing the naproxen, and ordering cyclobenzaprine 10 mg for neck stiffness, and meloxicam 7.5 mg for pain. Because Dye was also complaining about the capsaicin cream, Loria discontinued it and prescribed Bengay. In early September, at Dye's request, Loria changed the timing of Dye's dose of meloxicam to the afternoon.

Andrade saw Dye again on September 11 and October 21, 2013. Dye did not complain of neck pain at those appointments. At an October 30 meeting, which Dye calls a "staffing meeting," Dye said that he had not taken his medications in five days. Andrade told him that it would be safe for him to stop taking them if that is what he wanted to do. The parties dispute whether Dye said anything about neck pain. Andrade suspected that Dye might be malingering.

Dye saw Andrade again on December 5, 2013, after Dye complained of pain. Andrade noted that Dye did not appear to be in physical or emotional distress and that he had full range of motion in his neck and head. On December 14, a nurse wrote a note in response to Dye's complaint about neck pain stating that Dye had stopped taking his pain medications.

Dye saw Andrade on January 8, 2014. Dye requested "a medical work up for his neck." *Id.* at 57. Andrade says that she explained that Dye had been seen on multiple occasions for

his neck, but that Dye "stated that he did not care that that was the case [and] that he wanted to be re-evaluated anyway." *Id.* Dye wanted to be seen by someone other than Andrade.

On February 11, 2014, Dye had his last scheduled appointment with Andrade before being transferred to the Waupun Correctional Institution. Dye refused the appointment. Despite the refusal, Andrade wrote a "prescriber's order" for him to continue receiving his pain medication.

## B. Divalproex

At the time of the events in question, Dye was diagnosed with histories of generalized anxiety disorder, eating disorder, narcissistic personality disorder, and antisocial personality disorder. He was prescribed one psychotropic medication: divalproex. The parties agree that that medication was prescribed "for his anger largely." Dye had been taking that medication for at least 10 years.

At the October 30 meeting discussed above, Dye stated that he had not taken any of his medications for five days. Andrade told him that it would be safe for him to stop the divalproex altogether if he wanted. A note from a psychiatrist upon Dye's transfer to WCI stated that "it is not clear if [the divalproex] is of any benefit." *Id.* at 48.

By February 2015, Andrade was working at WCI. On February 20, Dye saw Andrade for a psychiatric appointment. Dye did not want to be seen by Andrade because he had brought this lawsuit against her. (Dye filed his original complaint against various defendants, including Andrade, in February 2014). According to Andrade, Dye was very oppositional and would not sit down. As he left the room, Andrade said that she would discontinue the divalproex if he refused the appointment, because good medical practice dictates that a patient be continually

assessed by his doctor. Dye says that Andrade "vindictively" told him that she would cancel his medication. Dkt. 65-9.

Andrade ordered Dye's divalproex reduced to 500 mg for one week followed by discontinuation. Divalproex has potential side effects such as liver or pancreas problems, weight gain, tremors, and sedation. There are no serious risks associated with tapering a patient off of it. Andrade set a follow-up appointment for a month later.

Exhibits detailing Dye's complaints about the incident show that Andrade stopped working at WCI in March 2015, and a new psychiatrist reinstated the divalproex prescription.

ANALYSIS

**A. Summary judgment standard**

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, the parties have filed cross-motions for summary judgment, I must consider the burden of proof each party would bear on an issue at trial, and then require the party with the burden to produce evidence showing that they have proven that issue; if the party fails to provide evidence in support of a particular issue that they must prove at trial, I may enter summary judgment against that party. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997); *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

**B. Neck pain treatment**

Dye contends that defendants Gaanan and Loria violated his Eighth Amendment right to adequate medical care by failing to change pain medications or attempt further treatment after he complained about the ineffectiveness of his medication.

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Defendants contend that Dye's neck condition was not an objectively serious medical need, stating that multiple examinations of his neck showed no more than "a mild change at one level of the cervical spine," Dkt. 52, at 15, and that Dye never appeared to them to be in significant pain. Although Dye does not provide his own declaration, it is clear that he is saying that he was in severe pain during the events at issue in this lawsuit. So I conclude that the extent of his pain is a disputed issue of material fact.

The problem for Dye on these claims is that he fails to show that Loria or Gaanan acted with deliberate indifference toward his reported pain, by persisting in treatment they knew to be ineffective. *See Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011). He attempts to support his claim by stating that he was seen by these two doctors only four times in his 13-month stay at WRC, but the number of visits alone is not sufficient to raise a reasonable inference that they acted with deliberate indifference. A long stretch of time without any care whatsoever might support a deliberate-indifference claim, but here, Dye was seen by one of these two defendants every few months to check in on their treatment. On its face, that seems quite reasonable, and Dye does not present evidence showing otherwise. Also, as discussed below, Dye alleges that the reason he didn't see general practitioners more is that defendant Andrade abused her role as gatekeeper by failing to refer him more often. Nurses addressing health service requests also made decisions on where to route a prisoner's concerns. Thus it appears that Gaanan and Loria had only limited control over scheduling appointments.

In any event, as the record shows, a doctor does not need to fully examine a patient to change a prescription—Loria changed his medication in response to its inadequacy in August 2013 without seeing him—and the real question here is whether defendants persisted in ineffective treatment. No reasonable jury could conclude that they did, because every time they saw Dye, they modified the type or dosage of medication in an attempt to find something that worked: Dye was prescribed Relafen, then an increased dosage of that drug,[2] then Naproxen,

---

[2] Dye argues that his increased dose of Relafen does not indicate Gaanan's concern about his neck pain, because his March 5 appointment focused on his thumb injury. But the fact remains that Gaanan doubled his dosage of the pain medication prescribed for his neck, so no reasonable jury could conclude that Gaanan ignored Dye's complaints of inadequate pain medication for his neck problem.

and then cyclobenzaprine and meloxicam.[3] They also tried two types of pain-relief cream, and Loria prescribed him physical therapy. This course of treatment shows that Gaanan and Loria attempted to help Dye with his pain; their failure to discover a treatment option that Dye found to work at most potentially states a claim for negligence, which is not enough to violate the Eighth Amendment. I will grant defendants summary judgment on this claim against Gaanan and Loria.

## C. Andrade's failure to treat neck pain or refer to others

Dye brings a claim that defendant Andrade violated his Eighth Amendment rights by refusing to schedule him to see a general practitioner for his neck pain or otherwise treat him, even though under prison policy he was required to see Andrade (a psychiatrist) before seeing a general practitioner. But the facts discussed above regarding Gaanan and Loria show that this is incorrect in a couple of respects. On at least a couple of occasions, Andrade did refer Dye to Gaanan and Loria, and she specifically stated that she was deferring to Gaanan's pain treatment. And the sheer number of contacts he had with Gaanan and Loria were not unreasonable. Dye also oversells the amount of control Andrade exercised: while Andrade generally acted as Dye's point person for medical treatment at WRC, nurses would decide whether to route Dye's health service requests to Andrade, other doctors, or respond themselves.

At most, there was a several-month stretch at the end of Dye's time at WRC where he did not see a general practitioner. But for part of the time, he was not complaining about neck

---

[3] The medical record shows that by the time Dye was seen by defendants Gaanan and Loria, he was prescribed gabapentin 300 mg for "chronic pain." Neither party discusses whether Gaanan or Loria ever changed or canceled this prescription, so I will not include this medication in my analysis of defendants' pain treatment.

pain, and at other times he admitted that he was not taking his medication as scheduled. Andrade also says that Dye did not appear to be in as much pain as he said he was, and was exaggerating his symptoms given that his x-ray results showed only mild degeneration. Nonetheless, she shepherded him through a few changes in medications. She balked at giving him an entirely new "work up" because he had already been receiving treatment. Dye clearly did not agree with Andrade's decisions, but a prisoner's dissatisfaction with treatment is not enough to support an Eighth Amendment claim. *Snipes*, 95 F.3d at 592. The question is whether Andrade's decisions were "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Id.* (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)). No reasonable jury could come to the conclusion that Andrade's actions meet that standard. Again, the WRC medical professionals' failure to land on a pain-treatment option that Dye found effective is at most a negligence claim. Accordingly, I will grant defendants' motion for summary judgment on this Eighth Amendment claim.

## D. Physical therapy

Dye brings a claim that defendant therapist "Eric" ended his physical therapy sessions without legitimate reason. The parties do not dispute that Dye was prescribed physical therapy or that it was ultimately canceled before Dye received all of his scheduled visits. But they do not agree about the proper defendant for this claim. Dye originally named the therapist defendant as "Eric," and defendants accepted service on behalf of Eric Koehler, a physical therapist at WRC.

But at summary judgment, defendants contend that Koehler is not the therapist who treated Dye. Rather, they say that Robert Rhodes was the physical therapist who treated Dye. The contemporaneous medical records associated with the therapy include signatures that are

difficult to decipher. *See* Dkt. 53-1, at 39 & 40. They are more consistent with Rhodes's name than Koehler's, but I cannot say with certainty whose signature they are. Dye disputes that Rhodes was his therapist, but he is unsure who did treat him. He says that Koehler was "possibly" the therapist, and he cites several exhibits in support, *see* Dkt. 64, at 7 and Dkt. 65-18 to 65-22, but those exhibits are other documents Dye created in which he refers to the therapist as "Eric." It is clear at this point that Dye is merely guessing at the true identity of the person who treated him.

This is an unusual dispute to have at this point in the proceedings. Even if it turned out that Dye now realized that he mistakenly referred to the therapist as Eric, I would be extremely reluctant to dismiss a pro se litigant's claim on account of mistaken identity, and I would instead likely give Dye a chance to amend his complaint to include the proper defendant. But in any event, the true identity of the therapist is not material to this case, because whether his therapist was Rhodes or someone else, Dye has failed to present evidence creating a genuine dispute of material fact on his Eighth Amendment claim.

Aside from the identity of the therapist, Dye does not dispute the broad contours of the treatment provided to him. Between exhibits attached to his amended complaint and the exhibits he provides at summary judgment, he appears to agree on the dates he was treated, and that the reminder of his sessions were abruptly canceled. That matches the medical records submitted by defendants.

I'll begin the analysis under an assumption that Rhodes was Dye's therapist. Rhodes provides his version of Dye's treatment history: he says that he assessed Dye, provided him with a "home exercise program," and wrote a plan of care for physical therapy for twice a week, for one to two weeks, for a total of three to four sessions. That version is supported by Dye's

medical records. Rhodes says that he terminated Dye after he "no-showed" for two appointments. By "no show," he means that Dye did not appear at the scheduled time for the appointment, but came late, only after officials had to track him down. Rhodes terminated him from the remaining one or two appointments after he concluded that Dye was not serious about the treatment. Dye provides very little of his own version the story, stating that he "lack[s] sufficient knowledge or information to form a belief as to the truth of (Rhodes) 'alleged' plan of care." Dkt. 64, at 7.

Besides arguing that Rhodes was not his therapist, Dye focuses on what he believes are contradictions in the evidence provided by defendants: the institution complaint examiner's report responding to his grievance about medical care states that Loria said that Dye "saw physical therapy twice but then did not show up for two appointments," when Rhodes said that Dye was *late* for those appointments but indeed eventually appeared. Dye says that this inconsistency creates a genuine dispute of material fact. I disagree, because the mere fact of ambiguity on this point does not mean a trial is necessary. At summary judgment I must choose the version that is most helpful to Dye, and the most helpful version here is that he was late to two appointments and did not show that he had been performing his home exercises, before Rhodes canceled further treatment.

But even accepting this version to be true, this isn't enough for a reasonable jury to conclude that Rhodes was deliberately indifferent to his neck pain. I have previously concluded that a therapist does not violate the Constitution by cutting a therapy plan short for the patient's noncompliance. *See Turner v. Hoechst*, No. 15-cv-23-jdp, 2017 WL 1173602, at *4 (W.D. Wis. Mar. 28, 2017) ("Hoechst cannot be deliberately indifferent for terminating therapy that Turner was not taking seriously: there is no point in having therapy sessions if the

patient does not show up."). Given the long wait list for prisoners to start physical therapy, Rhodes understandably did not have time to block out for inmates who would not commit to the treatment plan. Plus Rhodes says that he had already imparted the entire home exercise plan to Dye, and the bulk of instruction was already completed. So if Rhodes was indeed Dye's therapist, no reasonable jury could find in his favor given the facts presented at summary judgment.

If Rhodes was *not* actually Dye's therapist, this claim still doesn't survive summary judgment. It is Dye's burden to present the evidence that shows that his therapist was deliberately indifferent to his neck pain, but as stated above, he does not present his own version of events. He points to contradictions or what he believes are falsehoods in defendants' various evidence, but that still does not state a case for what *did* happen to violate his rights; rather, he mostly agrees with defendants' version: he was prescribed therapy, he saw the therapist three times, and then the therapy was terminated early. Piecing his position together from statements in his exhibits, Dye says that the medical and grievance records saying he "no showed" for two therapy session are "fabricated" because he actually attended those sessions. But the only reasonable meaning of "no show" in this context is that he did not show up for the scheduled appointment time, and he then came only after being prodded by prison officials. Dye does not present any evidence suggesting that his therapy was terminated for any reason other than his noncompliance with the appointment times. His mere speculation that his termination was for a nefarious reason is not enough to create a disputed issue of material fact. *See Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012) (speculation not enough to defeat motion for summary judgment). Accordingly, I will grant defendants summary judgment on this claim.

### E. Discontinuation of divalproex

Dye's final set of claims is about defendant Andrade's termination of his prescription for divalproex, a psychotropic medication used to treat his anger. I allowed Dye to bring claims under both Eighth Amendment deliberate indifference and First Amendment retaliation theories. I've already explained the Eighth Amendment deliberate indifference standard above. To prove a retaliation claim under the First Amendment, a plaintiff must identify (1) the constitutionally protected activity in which he was engaged; (2) one or more retaliatory actions taken by the defendant that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) sufficient facts to make it plausible to infer that the plaintiff's protected activity was one of the reasons defendant took the action he did against him. *Bridges v. Gilbert*, 557 F.3d 541, 556 (7th Cir. 2009).

Both claims rely to some degree on Andrade's rationale for her decision to discontinue the medication. If a reasonable jury could conclude that Andrade discontinued the medication in retaliation for Dye filing a lawsuit against her, I would allow both claims to proceed to trial. But the facts here could not lead a reasonable jury to that conclusion.

It is fair to say that Dye and Andrade did not get along. Dye believed that Andrade was restricting his access to medical treatment, and Andrade described Dye as an oppositional, entitled patient. And it appears that Dye was surprised that Andrade had followed him to WCI and was going to be his psychiatrist there. He refused treatment, stating that he currently suing Andrade, and Andrade responded that if they would not meet, she would discontinue his divalproex.

So did Andrade discontinue the medication because Dye refused treatment, because he mentioned that he was suing her, or for some other reason? Andrade said her decision was

based on best medical practices: a doctor should not prescribe a drug if the patient is unwilling to be assessed during the administration of that drug. It is Dye's burden to show that this rationale is a pretext, that is, a lie. *See Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006). He fails in that task.

Dye says that Andrade "vindictively said" that she was going to cancel his medication, but without more explanation, his interpretation of her tone is not enough. The parties obviously frustrated each other, and Andrade already had reason to be short with him given his refusal to be treated. Dye does not explain why her tone was related to the lawsuit.

The only evidence Dye brings to bear is the pure timing of the events: Andrade warned that she would discontinue the medication right after Dye mentioned his lawsuit, as he was walking out the door, rejecting the treatment. But suspicious timing by itself can only rarely support a retaliation claim. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 673 (7th Cir. 2009). Here, the vastly more plausible rationale is the one Andrade gave at the time: cancelation of the medication was the consequence for Dye refusing to meet with her. Without any other evidence supporting Dye's position, the plausibility of Dye's theory is so scant that no reasonable jury would rule in his favor on the retaliation claim.

Dismissal of the retaliation claim does not automatically doom Dye's deliberate indifference claim. Regardless of her reason for discontinuing the medication, Andrade would have violated the Eighth Amendment if her decision to do so was blatantly medically inappropriate. But here, Andrade explains that it was good practice to discontinue the medication given Dye's refusal to be treated. And generally, prison officials are not deliberately indifferent for failing to treat a prisoner who refuses that treatment. *See Cherry v. Berge*, 98 F. App'x 513, 515, 2004 WL 764141, at *2 (7th Cir. 2004) ("Cherry . . . consciously chose to

refuse to follow protocol and understood the consequences of that choice. . . . Because Cherry refused medication by electing to violate the rules, the defendants did not act with deliberate indifference in not dispensing his medication."). The prescription was reinstated after Andrade was no longer his provider, but mere disagreements among doctors about the proper course of treatment is not enough to state an Eighth Amendment claim, *see Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005), and there is no indication that Dye refused to see Andrade's replacement. Andrade also explains that Dye would not have faced dangerous side effects from withdrawal, and in fact he faced higher health risks by staying on the medication.[4]

There is no question that Dye was uncomfortable with being treated by Andrade. But prisoners must sometimes continue to interact with prison officials against whom they have filed grievances or lawsuits. Whether it is smart medical practice for a prison doctor to continue to treat an inmate who is suing her is a question for a medical ethics board or state malpractice law, not federal constitutional law. The question here is whether Andrade's specific actions violated the Eighth Amendment. I conclude that no reasonable jury could rule in Dye's favor on this claim.

Because I am granting summary judgment to defendants on the merits of each of Dye's claims, I need not address defendants' qualified immunity defense.

---

[4] Defendants also state that Dye had "no medical reason" for taking the drug and that it was not "needed for his health" s*ee* Dkt. 52, at 11, which I take to be an argument that Dye was not harmed by discontinuation of the medication. The parties do not clearly explain Dye's exact diagnoses, but they seem to agree that the medication was for his anger. The fact that he had been prescribed this psychotropic medication leads me to conclude that there is a genuine dispute over whether Dye would face *some* harm in having the drug discontinued. I take defendants to be saying that Dye did not face acute physical or mental injury be being weaned off the medication, and Dye does not argue otherwise. But it stands to reason that discontinuing a medication would thwart the objective of the original prescription.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 51, is GRANTED.

2. Plaintiff John Dye's motion for summary judgment, Dkt. 62, is DENIED.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered July 2, 2018.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge